E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
CLIFFORD D. MPARE (Cal. Bar No. 337818)
KEDAR S. BHATIA (Cal. Bar No. Pending)
Assistant United States Attorneys
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4962/4442
    Facsimile: (213) 894-0141
    E-mail:   clifford.mpare@usdoj.gov
             kedar.bhatia@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MARK WILLIAM ANTEN, <br><br> Defendant. | No. 2:24-CR-00002-WLH <br><br> GOVERNMENT'S SENTENCING POSITION <br><br> Hearing Date: November 22, 2024 <br> Hearing Time: 9:30 a.m. <br> Location: Courtroom of the <br> Hon. Wesley L. Hsu |

The government hereby files its sentencing position regarding defendant Mark William Anten.

The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, including the trial record, the Presentence Investigation

Report and Sentencing Recommendation, and any other evidence or argument that the Court may permit.

Dated: November 8, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

　　/s/
CLIFFORD D. MPARE
KEDAR S. BHATIA
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. **INTRODUCTION**

Over the course of six months in 2023, defendant Mark William Anten sent a barrage of threats to FBI Special Agents. He sent the special agents one email where he stated he "WILL UNABOMB THE LOS ANGELES FBI HQ." He sent another email where he said he "can go on a mass murder spree," and yet another email where he attached a photograph depicting an internet search for "how to make a dirty bomb." He sent cartoons showing Special Agents being bloodied and attacked, and he taunted the agents by showing up at their office and sending a photograph of him outside their building.

On June 3, 2024, trial commenced before a jury. At the trial, the jury heard harrowing testimony from the Special Agent who was the main target of defendant's threats, who described ultimately becoming so concerned about the threats that he would look around the parking lot when going into the office each day. June 5, 2024, the jury returned a verdict finding defendant guilty of two counts of making threatening communications, in violation of 18 U.S.C. § 875(c).

For his conduct, the government recommends the Court impose a sentence of 18 months in custody, which is at the mid-point of the Guidelines range, to be followed by a three-year period of supervised release. Such a sentence is sufficient, but not greater than necessary, to punish defendant's wrongful conduct and offer general and specific deterrence.

II. **STATEMENT OF FACTS**

Between July 2023 and his arrest in December 2023, defendant sent numerous threatening communications to the FBI, including the email communications described below that reference bombing the FBI

3

headquarters in Los Angeles. Defendant's threats were frequently aimed at a group of FBI agents with whom he previously had contact.

Among other things, on November 2, 2023, defendant sent an email to two FBI agents, saying "Let's see how far your hero will go to protect you. At some point, he will have to answer questions." Exh. 1016 (attached hereto as Exh. B).[1] He then attached a meme image suggesting that an FBI agent was a clown for "[p]laying games with both the FBI and the Unabomber." Id. at 3; see also Exh. 1036 (Exh. D) ("Your hero is under a relentless attack. He can't protect you forever.").

Later, on the same date, defendant emailed FBI agents saying he "embrace[d]" being voted most likely in his graduating class to become the next Unabomber, listing similarities between himself and the Unabomber, proclaiming that he was working on a manifesto, and signed his email "Unabomber." Exh. 1015 (Exh. A).

In an email the next day, on November 3, 2023, defendant wrote to another FBI employee that agents on his "list," like the agent who received the charged communications, would receive "[t]hreats of imprisonment and death." Exh. 1021 (Exh. C).

Defendant's threatening conduct continued and escalated. On December 5, 2023, for example, defendant sent a string of threatening emails to FBI agents. In one email with the subject "It's Only a Matter of Time," defendant closed the email with, "I don't care about death or SuperMax," a reference to high-security prison in Florence, Colorado, which is also where convicted Unabomber Ted Kaczynski

---

[1] Throughout this Memorandum, trial exhibits are marked with their exhibit numbers at trial and the letter of their attachment to this Memorandum.

4

served much of his term of imprisonment. Exh. 1179 (Exh. E). The same day, he sent an email saying "You three criminals had your chance." Exh. 1180 (Exh. F).

On December 5, 2023, defendant sent the email underlying Count One. Defendant wrote in the subject line, "Poor Scared Agent [Last Name]," and then said in the body of the message "I AM THE UNABOMBER" and "I WILL UNABOMB THE LOS ANGELES FBI HQ." Exh. 1193 (Exh. G). Defendant went on to say "I am supposed to be in Beverly Hills tomorrow for a meeting. I will swing by your office if there is time." Id. Defendant ended his email with, "[t]his ain't over," and signed it "UNABOMBER." Id.

On December 6, 2023, shortly after midnight, defendant emailed agents, "I can go on a mass murder spree. In fact, it would be very explainable by your actions." Exh. 1200 (Exh. I). He closed this email with, "You ain't getting away with this one," and signed it "SuperMax or Death." Id.

Defendant also emailed agents to say "Arrest me. Imprison me. Personally handcuff me, tough guy. I'll meet you at the FBI Building tomorrow with Lucky." Exh. 1195 (Exh. H).

Later on the same day, defendant then sent the email underlying Count Two. In that email, he wrote, "My Google Search," and then included an image depicting the results of a Google internet search for "how to make a dirty bomb." Exh. 1203 (Exh. J).

On December 6, 2023, defendant went to the FBI Los Angeles Headquarters building, which is in the Central District of California. Exh. 1204 (Exh. K). Later that day, defendant emailed agents confirmation that he went to the FBI Los Angeles Headquarters

5

building and would continue to do so. Id. Surveillance footage confirmed his presence. Exh. 2002-1, 2002-2 (videos).

At trial, the jury heard testimony from several witnesses, including the FBI Special Agent who was the recipient of many of defendant's threats. The Special Agent testified that he initially found defendant's wave of threats to be strange, then increasingly worrying. When he viewed the email messages underlying Counts One and Two at his work computer in Los Angeles, he found those messages to be threats.[2]

## III. PROCEDURAL HISTORY

On December 21, 2023, defendant was arrested at his home and charged in a criminal complaint. On January 3, 2024, the grand jury returned an indictment charging defendant with two counts of making threats by interstate communication, in violation of 18 U.S.C. § 875(c).

On June 3, 2024, trial commenced before the Court and a jury. On June 5, 2024, the jury found defendant guilty on both counts in the Indictment. On July 19, 2024, defendant filed a short post-trial motion for a judgment of acquittal, which the Court denied in an Order on August 19, 2024. Dkts. 87, 92.

## IV. PRESENTENCE REPORT

On October 17, 2024, USPO released the Presentence Investigation Report ("PSR"). In the PSR, the USPO calculated defendant's offense level as 14, based on the following calculation:

---

[2] Witness testimony is summarized here to the best of the government's recollection.

|   |   |   |   |
|---|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. § 2A6.1(a)(1) |
| More Than Two Threats: | +2 | U.S.S.G. § 2A6.1(b)(2)(A) |

PSR ¶¶ 30-45.

The USPO concluded that the zero-point offender reduction pursuant to U.S.S.G. § 4C1.1 did not apply, as the offense involved credible threats of violence. PSR ¶ 44.

Because the defendant has no criminal history points and is in Criminal History Category I, a total offense level of 14 results in a recommended sentencing range of 15 to 21 months' imprisonment. Id. ¶ 96. The USPO recommends a sentence of 15 months' imprisonment to be followed by two years' supervised release. See Probation Recommendation Letter, Dkt. 129, at 1-2.

**V.   GUIDELINES CALCULATION**

The government concurs with the PSR's Guidelines calculation. Defendant filed an objection to the PSR, dated October 31, 2024. Dkt. 95 ("Deft. Objection"). Defendant specifically argues for the following three modifications from the Guidelines calculation in the PSR: (1) the enhancement for more than two threats should not apply; (2) he should receive a two-level reduction as a zero-point offender because he did not make any credible threats of violence; and (3) he should receive a two-level departure because the conduct happened at a time when he was suffering from a significantly reduced mental capacity. These arguments are without merit and should be rejected.

**A.   THE PSR CORRECTLY CALCULATES THAT DEFENDANT MADE MORE THAN TWO THREATS UNDER U.S.S.G. §2A6.1(b)(2)(A)**

U.S.S.G. §2A6.1(b)(2)(A) provides for a two-level enhancement if "the offense involved more than two threats." Defendant argues that he made no true threats and, even if he did, the only communications

7

that meet that definition are the two charged threats. Def't Objection at 1-2. Under Application Note 1 to U.S.S.G. §2A6.1(b)(2)(A), in determining the number of threats, "the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole."

The undisputed trial record and the PSR cite several communications that are threats under the meaning of U.S.S.G. § 2A6.1(b)(2)(A), 18 U.S.C. § 875(c), and the relevant Supreme Court caselaw, in addition to the communications underlying Count One and Count Two:

1. Exh. 1016 (Exh. B): "Let's see how far your hero will go to protect you. At some point, he will have to answer questions," and attaching a threatening meme photograph. *See* PSR ¶ 15.

2. Exh. 1036 (Exh. D): "Your hero is under a relentless attack. He can't protect you forever. My personal love for you is immaterial to both of your actions. You know what you did. Your hero knows too. If you think it ended on that note, you are all greatly mistaken. If that means me in prison, that is an insignificant price to pay. I will do my time with pleasure. Starting right now," and attaching a threatening meme photograph. *See* PSR ¶ 16.

3. Exh. 1179 (Exh. E): "You think you got away with your criminal actions. Think again, sunshine. It ain't ending with me and Lucky on the lam and in an FBI Safe House because of your gross incompetence. I don't care about death or SuperMax." *See* PSR ¶ 15.

4. Exh. 1180 (Exh. F): "You three criminals had your chance."

8

Email subject line is "Re: Today is the Day." *See* PSR ¶ 17(ii).

    5.    Exh. 1195 (Exh. H): "Arrest me. Imprison me. Personally handcuff me, tough guy. I'll meet you at the FBI Building tomorrow with Lucky."

    6.    Exh. 1204 (Exh. K): "*I'll meet you at the FBI Building tomorrow with Lucky.* Where were you today? Agent Amir is a scaredy-cat. Agent Amir is a scaredy-cat. Agent Amir is a scaredy-cat. Scared of his own CHS.," and attaching photo of defendant outside the FBI building." *See* PSR ¶ 20.

Each one of the threats above constitutes a threat under U.S.S.G. § 2A6.1(b)(2)(A) and could supply the third threat, beyond the two specifically charged, to trigger the enhancement. Moreover, the threats should be viewed in context, and the avalanche of threatening messages added to the threatening nature of each message. *See United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 ("Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners."), *overruled on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1073 (9th Cir. 2002) (en banc).

In assessing whether this enhancement applied, the PSR notes correctly that defendant's "course of conduct and the volume of communicated threats to the FBI became increasingly threatening during this offense." PSR ¶ 36. The PSR accurately captures the escalation and seriousness of defendant's threats.

Accordingly, the two-level enhancement for making more than two threats under U.S.S.G. §2A6.1(b)(2) should be applied.

9

**B.   DEFENDANT CANNOT RECEIVE A TWO-LEVEL REDUCTION FOR ZERO-POINT OFFENDER UNDER §4C1.1 BECAUSE HIS THREATS WERE CREDIBLE**

Defendant also objects to the PSR's omission of a two-level reduction because, as he argues, he did not make any "credible threats of violence." Def't Objection at 2-3. Defendant here, again, argues that defendant's threatening communications were not credible threats, and he asserts that FBI never took defendant's threats seriously.

This is not so. Defendant points to one line in an email attaching a "Be on the Lookout" alert to support his position that the FBI did not believe his communications were threats. However, what defendant fails to acknowledge is that the very communication FBI distributed was sent to every FBI employee in the Los Angeles area and was specifically sent to provide the employees and their security personnel with information about defendant. The information was shared so widely to provide situational awareness about defendant's increasingly specific and worrying communications. The FBI's jargon in one line of a message does not undermine the overwhelming evidence that FBI took the threat seriously and that defendant's threats were credible threats.

Further, defendant's threatening communications were primarily targeted at one specific FBI Special Agent, who received a significant portion of the messages, and the testimony at trial was clear that this agent took defendant's threats seriously, perceived them as concerning, and, indeed, took actions to protect from potential danger stemming from defendant's increasingly unpredictable behavior. This included running a search on the type of car defendant drove, communicating with supervisors, and conferring with FBI

security about the communications.

Finally, defendant argues there was no indicia that he intended to harm anyone. This too does not square with the evidence presented at trial. Defendant makes constant references to himself as the Unabomber, and beyond the communications about committing mass murder and bombing the FBI headquarters, defendant took a number of concerning steps. For example, defendant shared a screenshot of a Google internet search on "how to make a dirty bomb." Defendant also wrote in one email admitted at trial, "You think you got away with your criminal actions. Think again, sunshine. It ain't ending with me and Lucky on the lam and in an FBI Safe House because of your gross incompetence. I don't care about death or SuperMax." In another email to an FBI agent, defendant wrote, "Arrest me. Imprison me. Personally handcuff me, tough guy. I'll meet you at the FBI Building tomorrow with Lucky." Shockingly, defendant actually traveled to the FBI building and sent the Special Agent a photograph as proof of his visit – all in the middle of a barrage of threatening messages. Exh. 1204 (Exh. K). Given the many efforts defendant took to intimidate, harass, and threaten members of the FBI and the FBI headquarters as a whole, the PSR correctly omits §4C.1.1 from its offense level calculation.

### C. NOTHING SUPPORTS DEFENDANT'S ARGUMENT THAT U.S.S.G. § 5K2.13 APPLIES

Finally, defendant argues that the PSR fails to apply a two-level downward departure because he was suffering from a "significantly reduced mental capacity" under § 5K2.13. The Application Note for that section defines significantly reduced mental to mean that "the defendant, although convicted, has a

11

significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

As a threshold matter, defendant is ineligible for a downward departure under the plain text of U.S.S.G. § 5K2.13 because "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved . . . a serious threat of violence." U.S.S.G. § 5K2.13(2).

In *United States v. Dela Cruz*, 358 F.3d 623 (9th Cir. 2004), the Ninth Circuit affirmed a district court's ruling that a defendant who made a telephonic bomb threat under 18 U.S.C. § 844(e) was ineligible for a departure under U.S.S.G. § 5K2.13. *Id.* at 625; *see also United States v. McDonald*, 444 F. App'x 710, 711, 713-14 (4th Cir. 2011) (holding that defendant who called his family members and said he would kill his ex-girlfriend had made serious threats that precluded a downward departure under U.S.S.G. § 5K2.13). By contrast, in another Ninth Circuit decision, *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001), the Court of Appeals held that a defendant who made threats as an "ill conceived prank" was eligible for a departure. *Id.* at 894-95; *see Dela Cruz*, 623 at 625 (contrasting the facts in that case to the facts in *Walter*). Here, defendant's communications were more like the *Dela Cruz* threats than the prank in *Walter*, and they were a "serious threat of violence," which precludes a departure under U.S.S.G. § 5K2.13.

Moreover, while the PSR does note that defendant has mental health struggles, PSR ¶ 60, neither the trial record nor the PSR suggest defendant was unable to understand the wrongfulness of the

12

threatening communications he made. Indeed, in some of his communications, defendant acknowledges that the communications are inappropriate and are threats. In one such message, defendant wrote, "Your hero is under a relentless attack. He can't protect you forever. My personal love for you is immaterial to both of your actions. You know what you did. Your hero knows too. If you think it ended on that note, you are all greatly mistaken. If that means me in prison, that is an insignificant price to pay. I will do my time with pleasure. Starting right now." Exh. 1036 (Exh. D). From defendant's own writing, it's clear he understood that his communications were at least inappropriate; but what's more, defendant seems to acknowledge understanding the potential consequences of such communications. *See, e.g.*, Exh. 1179 (Exh. E) ("I don't care about death or SuperMax"); Exh. 1195 (Exh. H) ("Arrest me. Imprison me. Personally handcuff me, tough guy.").

Further, defendant did not present any evidence that he is unable to control his behaviors. *See United States v. Bellrichard*, 801 F. Supp. 263, 269 (D. Minn. 1992) ("There are conflicting diagnoses concerning the mental condition of the defendant, but it is apparent from the expert reports that he is not without capacity to control the content of his letters or to tailor each to what he intends to express to the particular recipient. He has maintained all along that he said what he meant and meant each word that he said. . . . Whatever his overall psychiatric diagnosis, the record does not indicate that defendant is suffering from significantly reduced mental capacity within the meaning of [U.S.S.G. § 5K2.13].").

Indeed, to the opposite, since his arrest, defendant has "stressed he has no intention of contacting the FBI again nor does he

plan on emailing them." PSR ¶ 67; *see United States v. Davis*, 182 F. App'x 741, 2006 WL 1877208, at *2 (9th Cir. July 3, 2006) (affirming a district court's denial of a § 5K2.13 departure and noting that "repeated claims that Davis is unlikely to reoffend, or become a pedophile, cast doubt on the argument Davis now makes, which is that he is unable to control his behavior."). Defendant had the ability to restrain himself; he simply chose to send the charged threats.

## VI. SENTENCING RECOMMENDATION

### A. Applicable Law

The Court must impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a). The Court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In addition, the Court should fashion a sentence that reflects the seriousness of the offense, promotes respect for the rule of law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from future crimes of the defendant, among other considerations. 18 U.S.C. § 3553(a)(2).

### B. The Court Should Impose a Mid-Point Guidelines Sentence

The government respectfully submits that a sentence at the mid-point of the Guidelines range, 18 months' imprisonment, is appropriate. Such a sentence is warranted due to the nature and circumstances of the offense, the need to provide just punishment, and the need for general deterrence. This sentence is also sufficient but no greater than necessary to achieve the ends of sentencing.

*First*, the nature of the offense and seriousness of defendant's conduct demands a significant term of imprisonment. Defendant's

threats were incredibly serious. The FBI Special Agents who received defendant's threats are hard-working civil servants who were simply performing their duties when they started to receive a torrent of threatening messages from defendant. The Special Agents faced horrifying messages from defendant, like these:




*Exh. 1016 (Exh. B)*                *Exh. 1036 (Exh. D)*

While we know now that no violence ever came from the threats – perhaps because of the intervention of the criminal process – the Special Agents did not know that at the time. The Special Agent who was the primary target of the threats testified at trial that he had to look around the parking lot to see if Anten was lurking, and his fear was natural and predictable given defendant's messages. The seriousness of defendant's conduct calls for a significant term of imprisonment.

*Second*, an 18-month sentence is necessary to afford adequate deterrence to others in the community who make threats against law enforcement officers. While defendant's particular motive behind his threats was unique in some ways, it is unfortunately all too common

for civil servants to receive threats from disgruntled members of the public. The threats can have a lasting impact on government employees who must interface with members of the public every day.

In fact, just days after the verdict in this case, Attorney General Merrick Garland authored an opinion piece in the Washington Post highlighting the wave of threats against government employees. *See Opinion: Merrick Garland: Unfounded Attacks on the Justice Department Must End*, Washington Post (June 11, 2024), https://www.washingtonpost.com/opinions/2024/06/11/merrick-garland-justice-department-threats-fbi-2024/ (Exh. L). Leading with and citing the verdict in this case, the Attorney General noted "[t]hese heinous threats of violence have become routine in an environment in which the Justice Department is under attack like never before," and, "[i]n recent weeks, we have seen an escalation of attacks that go far beyond public scrutiny, criticism, and legitimate and necessary oversight of our work." *Id.*

The sentence in this case matters, and a substantial sentence is necessary to deter others who may take out their real or perceived grievances by threatening public employees. Those threats have no room in our democracy, and the sentence in this case should reflect the fact that those who threaten civil servants will receive meaningful punishment.

*Third*, a substantial sentence is appropriate to adequately deter defendant from making threats in the future. Defendant will return to the public after his term of imprisonment, and he will once again interact with civil servants in his day-to-day life. A meaningful term of imprisonment is required to show him that threats will not be tolerated.

Defense counsel recently shared with the government a psychological evaluation and assessment of the defendant. The assessment shows meaningful impairments, and the government hopes that defendant is able to benefit from resources available to him through the Bureau of Prisons, later the USPO, and other professionals. While the impairments do call for some leniency under the § 3553(a) factors, that leniency should result in a sentence of 18 months imprisonment, rather than an even higher sentence. Accounting for good time credits and First Step Act earned time credits, a sentence of 18 months' imprisonment would likely mean only a few more months in custody before the defendant can begin his term of supervised release.

Balancing the § 3553(a) factors, the government submits that a sentence of 18 months' imprisonment is sufficient but not greater than necessary.

The government also recommends a three-year term of supervised release. That term will give defendant the appropriate support and also help to ensure that, when released from custody, he will not return to making threats against public servants, including the Special Agents who were recently the subject of his threats.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully recommends that the Court sentence defendant to a mid-point Guidelines term of 18 months' imprisonment, a three-year term of supervised release, and the mandatory $100 special assessment.